UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| DEANA TODT, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| vs. | ) Case no. 1:18-CV-237 PLC |
| | ) |
| ANDREW M. SAUL,[1] | ) |
| Commissioner Social Security, | ) |
| | ) |
| DEFENDANT. | ) |

## MEMORANDUM AND ORDER

Plaintiff Deana Todt appeals the decision of Defendant Social Security Commissioner Andrew Saul denying her application for a period of disability and Disability Insurance Benefits (DIB) under the Social Security Act. For the reasons set forth below, the Court reverses and remands the Commissioner's decision.

### I.  Background and Procedural History

In October 2015, Plaintiff, who was born in August 1972, filed an application for DIB alleging that she became disabled on November 15, 2013 as a result of bipolar disorder, "chronic anxiety/panic attacks," fibromyalgia, migraine headaches, "severe insomnia," and chronic back and hip pain. (Tr. 114, 193-94) The Social Security Administration (SSA) denied Plaintiff's claim, and she filed a timely request for a hearing before an administrative law judge (ALJ). (Tr. 126-30, 133-34)

In December 2017, the ALJ conducted a hearing at which Plaintiff and a vocational expert testified. (Tr. 24-42) In a decision dated February 2018, the ALJ found that Plaintiff "has not

---

[1] At the time this case was filed Nancy A. Berryhill was the Deputy Commissioner of Social Security.

been under a disability, as defined in the Social Security Act, from November 15, 2013, the alleged onset date, through December 31, 2017, the date last insured[.]"  (Tr. 15-32)  Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review. (Tr. 1-6)  Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the SSA's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

II.     **Evidence Before the ALJ**

Plaintiff testified that she was forty-five years old, lived with her husband and sixteen-year-old daughter, and had an associate degree in "digital imaging technology."  (Tr. 48-50)  Plaintiff worked thirteen years for a television station, where she began her career as a graphic designer and was later promoted to art director.  (Tr. 52-53)  When Plaintiff stopped working in November 2013, she "was just so tired, that I really couldn't do my job very well.  Like my boss would catch me asleep underneath my desk."  (Tr. 54)

When the ALJ asked Plaintiff "the main reason you can't work," she answered: "Because I'm in so much pain, and things pop up like lately I've just had a lot of seizures, or just I get really, really tired.  I get really, really sick, and I have to lie down."  (Tr. 55-56)  Plaintiff testified that "at first" she was experiencing five or six seizures per day but, with medication, "the doctors have gotten them down … to maybe one every other day[.]"[2]  (Tr. 57)  Plaintiff explained that the seizures generally lasted about five minutes and, during the seizures, she could hear and feel touch, but she could not talk or respond to directions.  (Tr. 58, 93)  After what Plaintiff described as "light seizures," her stomach would be upset and she would "have to reorient herself."  (Tr. 93)  After a "hard seizure," she would "just want to go to sleep, and I will just lay on the table and be like,

---

[2] During the hearing, Plaintiff stated that she "getting really sick to my stomach" and believed she was going to have a seizure.  (Tr. 57)  At the request of Plaintiff's counsel, the ALJ announced a five-minute break.  (Id.)

2

listen, I just want to go to sleep." (Tr. 93) Despite her diagnosis with psychogenic, non-epileptic seizures, Plaintiff believed she suffered epilepsy. (Tr. 101-02)

Plaintiff stated that she experienced pain in her legs, back, neck, and head, and she estimated that she experienced migraines twice a week. (Tr. 56, 76) Plaintiff repeatedly stated that she was "in pain all the time." (Tr. 83) Plaintiff explained that her medications "help[] me to maybe have a normal day, out of a week, or maybe a couple hours out of that day." (Tr. 56) However, if Plaintiff "exert[ed] myself for one day….I'll be down for four days. And that's in bed, in pain, like in the fetal position, not able to do other things….I'll listen on the phone to like my religious meetings. I won't be able to go." (Tr. 56)

Plaintiff stated that she could neither lift nor walk and had been using a wheelchair for about two and a half years. (Tr. 60) Because her house was "too small" for the wheel chair, she used a walker at home and her husband "ha[d] put up handles." (Tr. 61) Despite these assistive devices, Plaintiff testified: "I've fallen in my house, I don't know how many times. People have to pick me up. (Tr. 61) In regard to her bipolar disorder, Plaintiff testified that she experienced emotional ups and downs and sometimes "I feel like I just can't get up in the morning, or I just can't get going." (Tr. 81-82) She was unable to sleep at night and sleep medications did not help. (Tr. 101)

Plaintiff testified that on a typical day she spent twenty-one hours in bed. (Tr. 60) When Plaintiff was not in her bed, she would sit on the couch with her feet up or lie in a zero-gravity chair. (Tr. 59) Plaintiff sat on a soft blanket "because everything that touches my body hurts. (Id.) On the two days per week that Plaintiff attended "Bible meetings," she spent eighteen hours

3

in bed. (Tr. 60). Plaintiff explained that her husband drove her to her meetings[3] and she would use a wheelchair then lie down in her zero-gravity chair. (Id.)

Plaintiff testified that she had been homeschooling her daughter for about four years, and she also homeschooled the fifteen-year-old son of a family friend. (Tr. 94-95) Plaintiff stated that she provided instruction "laying in bed….And I also have the answers in front of me, and I just grade their stuff. And whatever they've missed is what we go over." (Tr. 99) On days that Plaintiff was unable to teach the children, either they would "self-study" or her husband taught them.[4] (Tr. 57, 95, 99)

A vocational expert also testified at the hearing. (Tr. 104-09) The ALJ asked the vocational expert to consider an individual with Plaintiff's age, education, and work history who was able to perform sedentary work "involving simple, routine tasks, and simple, work-related decisions." (Tr. 105) The vocational expert stated that such an individual could not perform Plaintiff's past work as a graphic designer but could perform the jobs of document specialist, toy stuffer, and food and beverage order clerk. (Id.) When the ALJ added the limitation that the hypothetical individual "would miss work four or more days per month," the vocational expert stated that such an individual could not maintain employment. (Tr. 106) Nor could the hypothetical individual maintain employment if he were "off task 25% or more of the work day." (Id.)

---

[3] Plaintiff testified that she was "not allowed to drive" because she had seizures and took hydrocodone "when I'm under extreme pain[.]" (Tr. 50)

[4] When the ALJ asked Plaintiff why she decided to homeschool her daughter at the same time her "problems became so severe that you couldn't work at all," she explained that she "missed her growing up" and "[i]f I'm going to quit work, I'm going to try and spend time with my daughter, whether I'm disabled or not." (Tr. 97)

4

With respect to Plaintiff's medical treatment records, the Court adopts the facts provided by Plaintiff in her statement of facts and admitted by the Commissioner. [ECF Nos. 11-1, 16-1] The Court also adopts the facts set forth in the Commissioner's "statement of additional material facts" because Plaintiff does not refute them. [ECF No. 16-2]

### III. Standard for Determining Disability under the Social Security Act

To be eligible for benefits under the Social Security Act, a claimant must prove he or she is disabled. 42 U.S.C. § 423(a)(1); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 42 U.S.C. § 423(d)(1)(A); See also 20 C.F.R. § 404.1505(a). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 404.1520; see also McCoy v. Astrue, 648 F.3d 605, 511 (8th Cir. 2011). Those steps require a claimant to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. Id.

Prior to step four, the Commissioner must assess the claimant's residual functional capacity (RFC), which is "the most a claimant can do despite [his or her] limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). Through step four, the burden remains with the claimant to prove that he or she is disabled. Moore, 572 F.3d at 523. At step five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. Id.; Brock v. Astrue, 674 F.3d 1062, 1064 (8th Cir. 2012).

### IV. ALJ'S Decision

Applying the foregoing five-step analysis, the ALJ found that Plaintiff: (1) did not engage in substantial gainful activity during the period from her alleged onset date of November 15, 2013 through her date last insured of December 31, 2017; and (2) Plaintiff had the severe impairments of myalgia, obesity, conversion disorder, bipolar disorder, and generalized anxiety disorder, and the non-severe impairment of migraine headaches. (Tr. 17-18) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 20)

The ALJ reviewed Plaintiff's testimony and medical records and determined that, while her "medically determinable impairments could reasonably be expected to cause the alleged symptoms," Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (Tr. 24) More specifically, the ALJ found that: the "totality of the objective medical evidence of record is minimal at best"; Plaintiff "received nothing more than conservative medication management for her complaints of chronic pain and sickness"; and Plaintiff maintained

6

"regular daily activities." (Tr. 25-27) The ALJ also noted numerous inconsistencies between Plaintiff's comments to treating providers and her testimony at the hearing. (Tr. 27)

The ALJ determined that Plaintiff had the RFC to perform sedentary work "except the claimant is limited to work involving simple, routine task and simple work-related decisions." (Tr. 21) Based on the vocational expert's testimony, the ALJ found that Plaintiff could not perform her past relevant work, but "there were jobs that existed in significant numbers in the national economy that the claimant could have performed[.]" (Tr. 30) The ALJ therefore concluded that Plaintiff was not disabled. (Tr. 31)

**V.     Discussion**

Plaintiff claims the ALJ failed to properly consider her conversion disorder when he: (1) did not address whether her symptoms satisfied the criteria under Listing 12.07; (2) found her subjective allegations were not persuasive; (3) assigned great weight to the opinion of the consultative examiner; and (4) discounted the opinions of Plaintiff's treating sources.[5] [ECF No. 11]  In response, the Commissioner asserts that the ALJ "properly considered Plaintiff's conversion disorder throughout the sequential evaluation process and his conclusions are supported by substantial evidence." [ECF No. 16]

A. Standard of Judicial Review

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Chesser v. Berryhill, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)). The Court must consider "both evidence that supports and evidence that detracts from the

---

[5] For ease of analysis, the Court addresses Plaintiff's claims out of order.

ALJ's decision, [but it] may not reverse the decision merely because there is substantial evidence support[ing] a contrary outcome." Id. (quoting Prosch, 201 F.3d at 1012) (internal quotation marks omitted).

A court does not "reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determination are supported by good reasons and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)). Therefore, a court must affirm the ALJ's decision if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings[.]" Wright v. Colvin, 789 F.3d 847, 852 (8th Cir. 2015) (quoting Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011)).

B. Medical Opinion Evidence

Plaintiff claims the ALJ erred in formulating her RFC because he failed to properly consider her conversion disorder[6] when he discounted the opinions of her treating physicians and assigned significant weight to the opinion of a consultative examiner. The Commissioner counters that the ALJ properly evaluated the medical opinions.

In determining a claimant's RFC, the ALJ is required to consider the medical opinion evidence of record together with the other relevant evidence. 20 C.F.R. § 404.1527(b). "The

---

[6] "Conversion disorder is a phenomenon in which a person actually and subjectively experiences symptoms without a known underlying medical cause." Nowling v. Colvin, 813 F.3d 1110, 1113-14 (8th Cir. 2016) (citing Easter v. Bowen, 867 F.2d 1128, 1129 (8th Cir. 1989)). "It is believed the symptoms, such as non-epileptic seizures, result from an unconscious, involuntary conversion of mental stress into a physiological symptom." Id. at 1114. The Eighth Circuit recognized the difficulty of assessing how such orders limit a person's activities because "a prime feature of conversion disorder may be a disconnect between the actual severity of symptoms demonstrated by clinical evidence and the way the applicant subjectively perceives the symptoms." Id. (citing Easter, 867 F.2d at 1130).

8

opinion of a treating physician is accorded special deference under the social security regulations." Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000). Indeed, "[t]he ALJ must give 'controlling weight' to a treating physician's opinion if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'"[7] Papesh v. Colvin, 786 F.3d 1126, 1132 (8th Cir. 2015) (quoting Wagner v. Astrue, 499 F.3d 842, 848-49 (8th Cir. 2007)). See also 20 C.F.R. § 404.1527(c)(2). "Even if the [treating physician's] opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight." Id. at 1132 (quoting Samons v. Astrue, 497 F.3d 813, 818 (8th Cir. 2007)).

If an ALJ declines to ascribe controlling weight to the treating physician's opinion, he or she must consider the following factors in determining the appropriate weight: length and frequency of the treatment relationship; nature and extent of the treatment relationship; evidence provided by the source in support of the opinion; consistency of the opinion with the record as a whole; and the source's level of specialization. 20 C.F.R. § 404.1527(c). Whether the ALJ grants a treating physician's opinion substantial or little weight, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation." Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (quoting 20 C.F.R. § 404.1527(d)(2)). "Failure to provide good reasons for discrediting a treating physician's opinion is a ground for remand."

---

[7] For claims filed on or after March 27, 2017, the regulations have been amended to eliminate the treating physician rule. The new regulations provide that the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources," but rather, the SSA will consider all medical opinions according to several enumerated factors, the "most important" being supportability and consistency. 20 C.F.R. § 404.1520c. Plaintiff filed her application in 2015, so the previous regulations apply.

Anderson v. Barnhart, 312 F.Supp.2d 1187, 1194 (E.D. Mo. 2004). See also Tilley v Astrue, 580 F.3d 675, 680-81 (8th Cir. 2009); Singh v. Apfel, 222 F.3d 448, 452-53 (8th Cir. 2000).

   *1. Dr. Lee*

Plaintiff challenges the ALJ's decision to assign "little weight" to the opinion of her treating neurologist Dr. Lee. More specifically, Plaintiff argues that the ALJ based his assessment of Dr. Lee's opinion on the absence of supporting objective evidence, which "misses the point of [Plaintiff's] serious mental problem," conversion disorder. [ECF No. 11 at 9] The Commissioner counters that the ALJ properly considered the medical opinion evidence "in the context of the record as a whole." [ECF No. 16 at 13]

Plaintiff began seeing neurologist Dr. Lee for generalized body pain and weakness in March 2017. (Tr. 728) Plaintiff reported using a wheeled walker for ambulation for one year. (Tr. 729) In May 2017, Plaintiff informed Dr. Lee that she was experiencing two to three migraine-like headaches per week, and he prescribed Topamax. (Tr. 727-28) In July 2017, Plaintiff reported that her headaches had decreased to one or two per week. (Tr. 723)

In August 2017, Plaintiff returned to Dr. Lee's office for headaches and "seizure-like events," which began the previous month. (Tr. 720) Approximately two weeks later, Dr. Lee noted that Plaintiff's headaches were "under adequate control" but she continued to experience seizure-like events. (Tr. 720) Dr. Lee ordered an EEG, which recorded two seizure-like events that "were not associated with epileptic activity in either hemisphere." (Tr. 935-36) Dr. Lee diagnosed Plaintiff with psychogenic, nonepileptic events.[8] (Tr. 593)

---

[8] In September 2017, Plaintiff sought a second opinion from Dr. Yidala, who performed video EEG monitoring. (Tr. 593-95) Dr. Yidala observed "3 typical events characterized by bicycling movements of the legs with alternate flexion and extension, head turned to the left, moaning followed by upper extremity and head side to side shaking, each lasting approximately 3-4

Plaintiff returned to Dr. Lee's office in October 2017 and reported a "severe headache on 10/13/17," "severe spasms over the bitemporal area of her head," and "concurrent seizure-like activity." (Tr. 716) Plaintiff also stated that the "[y]esterday, she reportedly had a staring spell and fell to the ground[.]" (Id.) Plaintiff continued to suffer "intractable headaches and up to 4-5 seizure-like events daily." (Id.) Dr. Lee increased Plaintiff's Topamax and referred her to the Mayo Clinic. (Tr. 717)

Dr. Lee completed a physical MSS for Plaintiff in November 2017. (Tr. 704-06) Dr. Lee listed Plaintiff's diagnoses as: "fibromyalgia, intractable migraines, chronic fatigue, nonepileptic events, bipolar disorder, and anxiety disorder." (Tr. 704) Where the form requested Plaintiff's symptoms, Dr. Lee wrote "generalized pain, dizzy in AM, fatigue, seizure-like events," and he described her pain as "constant" and rated it 8/10. (Id.) Dr. Lee stated that her medications included Lyrica, tizanidine, Norco, Naprosyn, Cymbalta, Topamax, and Maxalt, and they caused "fatigue/malaise." (Id.)

In the MSS, Dr. Lee opined that Plaintiff could: never carry twenty pounds, twist, crawl, or climb; rarely stoop or crouch; and occasionally carry ten pounds, balance, and reach. (Tr. 705) Dr. Lee estimated that Plaintiff could sit for fifteen minutes at a time and stand for ten minutes at a time for less than two hours total in an eight-hour workday. (Tr. 705) Dr. Lee also stated that Plaintiff would need to: shift positions at will from sitting, standing or walking; take at least four unscheduled breaks per workday and rest an average of one hour before returning to work; and elevate her legs twenty-five percent of the workday. (Tr. 705-06) Finally, Dr. Lee opined that

---

minutes." (Tr. 593) Like Dr. Lee, Dr. Yidala concluded that these were "not epileptic seizures and are related to conversion disorder (psychogenic nonepileptic events)." (Tr. 593)

11

Plaintiff was incapable of "low stress" work, would miss more than four days of work per month, and would be "off task or slower" at least twenty-five percent of the workday. (Tr. 706)

In his decision, the ALJ acknowledged that Dr. Lee was Plaintiff's treating neurologist and assigned his opinion "little weight." The ALJ explained that "the finding of such extreme limitations, including being off task 25% of the time and missing more than four days per month, is inconsistent with the objective evidence of record including Dr. Lee's own treatment notes." (Tr. 29) The ALJ also stated that "such limitations appear to be solely based upon the claimant's subjective complaints." (Id.)

Under the framework provided by the regulations, Dr. Lee's opinion was entitled to controlling weight. Dr. Lee treated Plaintiff regularly between March and October 2017 and he was a specialist in the area in which he rendered his opinion. Moreover, contrary to the ALJ's finding, Dr. Lee's medical opinion was consistent with his treatment notes. Dr. Lee regularly noted Plaintiff's headaches and, beginning in August 2017, her seizure-like events. Dr. Lee's opinion was also consistent with those of Plaintiff's psychiatrist and counselor, who both estimated that Plaintiff would miss more than four days of work per month and be off task at least twenty-five percent of the workday. The ALJ's unsupported reference to inconsistency with the record as a whole fails to satisfy the regulations' "require[ment] that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation." Nowling, 813 F.3d at 1123 (quoting Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005)).

To the extent the ALJ discounted his opinion because it was inconsistent with the objective medical evidence and based on Plaintiff's subjective complaints, the Court is mindful that "an essential feature of … conversion disorder is that a patient's symptoms are actually and subjectively experienced without an underlying medical cause[.]" Christi S. v. Berryhill, 2018

WL 3586277, at *3 (D.S.D., 2018) (citing Nowling, 813 F.3d at 1113-14). In light of Plaintiff's conversion disorder, which the ALJ determined was a severe impairment, the fact that Dr. Lee's opinion was based on Plaintiff's subjective responses does not diminish its credibility. Substantial evidence did not support the ALJ's decision to discount Dr. Lee's medical opinion.

2. *Dr. Khot*

Plaintiff also claims the ALJ erred in assigning little weight to the opinion of her treating psychiatrist Dr. Khot. Plaintiff established mental health care with Dr. Khot in July 2014 and reported "a long history of manic symptoms manifested by increased energy, racing thoughts, can't sleep, restlessness, being impulsive, being talkative" and "spells of depression which are more commonly manifested by sad mood, crying spells, decreased energy, decreased motivation, poor sleep…." (Tr. 394) Dr. Khot diagnosed Plaintiff with bipolar I disorder and generalized anxiety disorder and assigned her a GAF score of 55. (Id.) He continued Plaintiff's Tegretol, prescribed Vistaril, and adjusted her dosages of Cymbalta and Ativan. (Tr. 395) In August and October 2014, Plaintiff reported improvement to Dr. Khot. (Tr. 409, 412)

In January 2015, Dr. Khot noted that Plaintiff was stable with medications but complained of "anxiety on and off usually triggered [by] stress" and chronic pain. (Tr. 407) In August 2015, Plaintiff reported "some depression." (Tr. 403) In January 2016, Plaintiff informed Dr. Khot that she was "doing ok" but "her chronic pain from the fibromyalgia has been an ongoing stress." (Tr. 428)

In April 2016, Dr. Khot again noted that Plaintiff "was doing ok but anxiety, some mood swings and pain issues[.]" (Tr. 669) Dr. Khot increased Plaintiff's Tegretol, discontinued Ativan, and reduced her Restoril, and prescribed klonopin. (Id.) The next month, Plaintiff informed Dr. Khot she was experiencing "anxiety, some insomnia, and pain issues," as well as "episodic periods

13

of crying" and "episodic mood swings…, trouble with motivation, anxious and has racing thoughts…." (Tr. 667) About one week later, Plaintiff was hospitalized for suicidal ideation. (Tr. 448-49)

At Plaintiff's appointments in July and October 2016, she complained of depression, anxiety, insomnia, and pain. (Tr. 663-65) Dr. Khot discontinued Restoril and prescribed Belsomra. (Tr. 663) When Plaintiff returned to Dr. Khot's office in December 2016, she reported improved sleep.[9] (Tr. 661) When Plaintiff returned to Dr. Khot's office in March 2017, she complained of insomnia, and Dr. Khot discontinued Belsomra and prescribed Sonata. (Tr. 659)

Dr. Khot completed his first mental MSS for Plaintiff in May 2017. (Tr. 443-44) Dr. Khot stated that Plaintiff had bipolar I disorder and general anxiety disorder, and he estimated that she would experience "bad days" causing her to leave or miss work four days per month and would "off task" twenty-five percent or more of the workday. (Tr. 443) Dr. Khot opined that Plaintiff was "extremely limited" in seven areas of mental functioning, including her ability to: understand, remember, and carry out detailed instruction; maintain attention for extended periods; complete a normal workday and workweek without interruption from psychologically based symptoms; accept instructions and respond appropriately to criticism; and respond to changes in work setting. (Tr. 443-44) Dr. Khot stated that Plaintiff was "markedly limited" in her ability: to understand, remember, and carry out short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual; sustain an ordinary routine; work in coordination and proximity to others; and interact with the general public. (Id.)

---

[9] In January 2017, Plaintiff went to the emergency room with a rash on her face and "depression due to being sick all the time." (Tr. 572) Plaintiff sought "evaluation of increased physical and emotional pain" and reported becoming "very frustrated at home. States that she is unable to do many of the things she used to do [due to] pain of [fibromyalgia]. States she worries if there was a fire, if she would even be able to make it out of the house." (Tr. 573)

14

At Plaintiff's appointment with Dr. Khot in July 2017, she reported continued difficulty sleeping and "some crying episodes which she seems to just bawl and feel out of control…." (Tr. 657) Dr. Khot discontinued Sonata and prescribed Seroquel. (Tr. 658) In September 2017, Plaintiff described an "up tick of seizures over the past month about 4-5 times a day." (Tr. 655) Plaintiff explained that she was admitted to the hospital and felt "frustrated" because two neurologists determined the seizures were "non epileptic and psychogenic in origin." (Tr. 655) Dr. Khot increased Plaintiff's Tegretol, restarted trazodone, and continued Cymbalta and klonopin. (Tr. 655-56) Plaintiff's symptoms were essentially unchanged in October 2017, and Dr. Khot discontinued trazodone. (Tr. 653)

Dr. Khot completed a second mental MSS For Plaintiff in November 2017. (Tr. 695-96) Dr. Khot again stated that Plaintiff's mental conditions would cause her to miss work four days a month and be "off task" at least twenty-five percent of the workday. (Tr. 695) Dr. Khot opined that Plaintiff was "extremely limited" in eight areas of mental functioning, including the ability " to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest." (Tr. 696) In December 2017, Dr. Khot wrote a letter stating: "I don't feel in her current mental state she can hold down productive employment." (Tr. 703)

The ALJ assigned Dr. Khot's medical opinions "little weight" because "some of the statements are conclusory in nature, and others are so extreme to the point that such findings are inconsistent with other medical evidence of record…." (Tr. 28) In support of this statement, the ALJ pointed generally to Dr. Khot's treatment notes from February 2014 through September 2015 and April 2016 through October 2017. (Id.) Finally, the ALJ stated that Dr. Khot's opinions were "apparently based extensively on the claimant's self-reported limitations." (Id.)

Under the framework provided by the regulations, Dr. Khot's opinion was entitled to controlling weight. Dr. Khot was Plaintiff's treating psychiatrist and was a specialist in the area upon which he rendered his opinion. It is also significant that Dr. Khot treated Plaintiff regularly for more than three years. See 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). As Plaintiff's treating psychiatrist, Dr. Khot was "likely to be the medical professional[] most able to provide a detailed, longitudinal picture of [Plaintiff's] medical impairment(s)" and he "bring[s] a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone or from reports of individual examinations[.]" 20 C.F.R. § 404.1527(c)(2).

The ALJ's conclusory observations that Dr. Khot's opinions were not supported by either his treatment notes or the other medical evidence of record (and his general citation to all or most of Dr. Khot's treatment records) did not adequately explain his reasons for discrediting Dr. Khot's opinions. Furthermore, contrary to the ALJ's finding that Dr. Khot's opinions were not supported by his treatment notes, Dr. Khot's treatment notes reflected that Plaintiff regularly complained to Dr. Khot of depression, anxiety, crying spells, and poor sleep. While Dr. Khot usually noted that Plaintiff was "stable" or "doing ok," he regularly adjusted Plaintiff's medications, suggesting that her symptoms were not controlled.

Additionally, Dr. Khot's opinion was consistent with the observations and opinions of Plaintiff's other treating sources. For example, in March and July 2016, Plaintiff complained to her primary care physician of Dr. Kasten of anxiety, excessive worry, and difficulty sleeping. (Tr. 635, 638, 641-42)

16

Dr. Khot's opinion was also consistent with the treatment records of Plaintiff's counselor, Mr. Hester, LPC.[10] Although licensed professional counselors are not "acceptable medical sources" under the regulations, Mr. Hester's treatment notes may still be properly considered as other medical evidence because they are consistent with Dr. Khot's opinion regarding Plaintiff's limitations. See, e.g., Wigfall v. Berryhill, 244 F.Supp.3d 952, 965-66 (E.D.Mo. 2017).

Mr. Hester began monthly counseling Plaintiff in June 2016. (Tr. 689) At her first two sessions, Plaintiff was "hyper-verbal" and reported pain and the desire to "get coping skills." (Tr. 671-89) In January 2017, Plaintiff informed Mr. Hester that her pain had increased and her "her anxiety had gotten high" and she "was having panic attacks." (Tr. 680) This same month, Mr. Hester completed a mental MSS For Plaintiff. (Tr. 548-49) Like Dr. Khot, Mr. Hester opined that Plaintiff's symptoms would cause her to miss four days of work per month and be off task at least twenty-five percent of the day. (Id.)

In February 2017, Mr. Hester noted that Plaintiff's "pain level has been very high and impact[s] mood." (Tr. 679) In March, April, and May 2017, Plaintiff informed Mr. Hester that, as a result of her "very high" pain level, she was feeling increasingly tired and depressed and was spending more time in bed. (Tr. 674-77) Plaintiff's condition worsened in August 2017 and she presented to Mr. Hester with "some depression and anxiety." (Tr. 673) Mr. Hester noted that Plaintiff was tearful and described her recent seizure-like episodes and loss of driving privileges. (Tr. 673) Two weeks later, Plaintiff's mood was the same and she reported "having around 2 seizures daily." (Tr. 672) In September 2017, Plaintiff was not "not sleeping due to pain,"

---

[10] The ALJ assigned "very little weight" to a mental MSS completed by Mr. Hester in January 2017 because he was not an acceptable medical source and he reported "significant side effects from the medication despite repeated denials by the claimant of side effects throughout [Dr. Khot's] treatment notes." (Tr. 28)

continued to experience several seizures daily, and reported "a desire at times 'to go to sleep and not wake up' to be free from pain." (Tr. 671)

Contrary to the ALJ's conclusory statement, Dr. Khot's medical opinion was consistent with the other medical evidence of record, including the treatment notes of Plaintiff's primary care physician and counselor. See, e.g., Condon v. Berryhill, 286 F.Supp.3d 994, 1011-12 (S.D. Iowa 2017) (ALJ gave inadequate weight to treating psychologist's opinion that, as a result of the plaintiff's somatoform disorder, she could not maintain concentration, attention, and pace in a normal competitive work environment). The Court therefore finds that the ALJ's decision to assign Dr. Khot's opinion little weight was not supported by substantial evidence.

*3. Dr. Karshner*

Finally, Plaintiff argues the ALJ erred in relying on the opinion of consultative examiner Dr. Karshner because Dr. Karshner "based his opinion on his own physical exam findings without considering [Plaintiff's] conversion disorder." [ECF No. 11 at 8] In response, the Commissioner contends that the ALJ "could reasonably find the opinion of the physical consultative examiner to be consistent with and supported by the other evidence of record." [ECF No. 16 at 13] The Commissioner asserts that Dr. Karshner "stated that Plaintiff's self-perception of impairment/disability was impacted [by her mental impairments], but nevertheless opined that she could perform sedentary work." [Id.]

"As a general matter, the report of a consulting physician who examined a claimant once does not constitute substantial evidence upon the record as a whole, especially when contradicted by the evaluation of the claimant's treating physician." Wigfall, 244 F.Supp.3d at 967 (quoting Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007)). Dr. Karshner completed a physical examination of Plaintiff in January 2016 and noted that Plaintiff: arrived in a wheelchair but was

18

able to stand, walk with a normal gait, and bend forward; had "intact" sensation and normal muscle tone, mass, and strength in upper and lower extremities; and demonstrated tenderness in multiple areas of back and "positive Waddell signs with light touch, which is not physiological." (Tr. 434-37) Dr. Karshner also examined Plaintiff's wheelchair, which she claimed to have been using two to three days a week for over one year, he and determined that it was "a seldom used piece of equipment." (Id.) Dr. Karshner found "no true neurologic abnormality anywhere" and concluded: "Physical findings on examination do not necessarily confirm presence of tender points consistent with fibromyalgia; nearly everything is tender including control areas. It is felt that axis I diagnosis are affecting claimant's pain perception." (Tr. 437)

The ALJ assigned "significant weight" to Dr. Karshner's opinion that Plaintiff "maintained the ability to perform and sustain work-related activities at a sedentary level of exertion." (Tr. 28) In support of his assessment, the ALJ wrote only: "This is consistent with the totality of the objective evidence of record." (Id.)

Here, Dr. Karshner examined Plaintiff on a single occasion in January 2016, over one year before Plaintiff began treatment with Dr. Lee and nearly two years before the ALJ's December 2017 hearing. Dr. Karshner's examination also preceded Plaintiff's psychogenic, non-epileptic seizures and conversion disorder diagnosis. The amount of time that elapsed and the number of medically significant intervening events that occurred after Dr. Karshner evaluated Plaintiff, were reasons for the ALJ to discredit Dr. Karshner opinion. See McCoy, 648 F.3d at 616; Carder v. Berryhill, No. 4:17-CV-2410-JMB, 2018 WL 4184327, at *9 (E.D. Mo. Aug. 31, 2018).

Furthermore, although Dr. Karshner acknowledged that Plaintiff's axis I, or bipolar, disorder might affect her pain perception, it is not clear that he considered the extent to which her pain perception affected her physical functioning. See, e.g., Bailey v. Colvin, No. 4:13-CV-1846

19

CAS, 2015 WL 5735235, at *18 (E.D. Mo. Sept. 29, 2015) (ALJ erred in relying on opinion of consulting physician who "considered purely organic bases" and not the "extent to which plaintiff's physical ability was subjectively affected by her pain disorder" when assessing her physical limitations). Given the timing of Dr. Karshner's examination and his apparent failure to consider her conversion disorder when determining her physical ability to engage in work-related activities, substantial evidence did not support the ALJ's decision to assign Dr. Karshner's opinion significant weight.[11]

## VI. Conclusion

For the reasons stated above, the Court finds that the ALJ failed to properly weigh the medical opinion evidence and thus failed to properly assess Plaintiff's disability claim such that substantial evidence does not support the ALJ's determination. See, e.g., Gordon v. Astrue, 801 F.Supp.2d 846, 859 (E.D.Mo. 2011). Defendant's decision is reversed and remanded for an appropriate analysis of the medical opinion evidence.

Accordingly,

**IT IS HEREBY ORDERED** that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner is **REVERSED**, and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

An order of remand shall accompany this memorandum and order.

                                                                      /s/ Patricia L. Cohen
                                                                      PATRICIA L. COHEN
                                                                      UNITED STATES MAGISTRATE JUDGE

Dated this 10th day of April, 2020

---

[11] Because the Court reverses and remands on the ground that the ALJ failed to properly evaluate the medical opinion evidence, it does not address Plaintiff's remaining claims of error.